HERMAN B. BOUTET, Respondent, *v.* THE CITY OF NEW YORK, Appellant.

First Department, February 10, 1922.

Municipal corporations — city of New York — negligence — action against city for injuries caused plaintiff by falling from sidewalk into areaway on southerly side of City Court House — verdict against weight of evidence — new trial ordered — city in maintaining areaway performed governmental function and is not liable for negligence — negligence in maintaining sidewalk is only theory on which city can be held liable — prejudicial to show that fence had been erected since accident, especially as jury visited premises although court instructed them to disregard it — Code of Ordinances of City of New York, chap. 23, § 161, not applicable to open areas on public grounds.

The plaintiff while walking along a sidewalk in the City Hall Park, borough of Manhattan, New York, was jostled by another pedestrian and fell into an areaway on the southerly side of the City Court House and sustained injuries for which he recovered a verdict. The areaway is about six feet, eight inches wide and two feet, eight inches deep and is for the purpose of giving light and air to the basement of the building. Between the areaway and the sidewalk from which the plaintiff fell is a stone coping twelve inches wide and varying from one and one-half inches to seven and one-half inches in height. A stairway in front of the building projects out a considerable distance beyond the line of the coping which would tend to guide pedestrians away from the areaway. The sidewalks in the City Hall Park are extensively used and at times congested. There was evidence that the sidewalk, areaway and coping had been in the same condition for at least twenty-six years, and probably nearly seventy years, but no similar accident had occurred. The theory upon which the plaintiff recovered was that the defendant was negligent in so maintaining or in failing to guard the areaway.

*Held*, that the verdict was against the weight of evidence and a new trial must be had.

The defendant in maintaining the areaway and coping, which were appurtenances to the court house, was performing a governmental function, as distinguished from its corporate functions, and cannot be held liable for any negligence in respect thereto. The only possible theory on which the city can be held liable is for negligence in maintaining the sidewalk.

It was prejudicial to the defendant to have the fact brought out on the trial that a fence had been erected on the coping after the accident, especially as the jury inspected the premises, although the court instructed the jury that they should not be influenced because of the erection of a fence.

Section 161 of chapter 23 of the Code of Ordinances of the City of New York, which provides for inclosing open areas with railings, does not apply to areas on public grounds and, hence, is not applicable here.

DOWLING and PAGE, JJ., dissent.

APPEAL by the defendant, The City of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 3d day of March, 1921, upon the verdict of a jury for $1,000, and also from an order entered in said clerk's office on the same day denying defendant's motion for a new trial made upon the minutes.

*John P. O'Brien, Corporation Counsel [Elliot S. Benedict* of counsel; *John F. O'Brien* and *David C. Broderick* with him on the brief], for the appellant.

*Coleman, Stern & Gotthold [Richard J. Cronan* of counsel], for the respondent.

LAUGHLIN, J.:

The action was brought and recovery had for personal injuries sustained by plaintiff from falling into an areaway on the southerly side of the " Brownstone Building," known as the City Court House, in the City Hall Park in the borough of Manhattan, New York. There are three buildings in the City Hall Park. One is the old City Hall proper, and the others are known as the County Court House and the City Court House, which are located northerly of the City Hall and substantially in a line between Broadway on the west and Center street on the east. Between the two buildings and Chambers street, the City Hall Park is open, consisting of sidewalks and grass plots, and the opening between the two buildings runs northerly and southerly and is about forty-two feet in width. There is in this opening a sidewalk twenty-five feet, nine inches, in width, passing along the easterly edge of the County Court House and extending to the sidewalk on the southerly side of Chambers street, and between the easterly side of the walk and the City Court House there is a grass plot with a low railing separating it from the sidewalk. There are entrances to both court houses from the southerly side,

and along that side there is a sidewalk crossing the park from west to east. There are two entrances to the City Court House from the southerly side, one through the basement, and the other by the stairway over the basement, giving access to the first floor. The access from the sidewalk to the basement is by steps descending northerly, from the north line of the sidewalk, two feet, eight inches, below the level of the sidewalk, to an areaway extending from the basement entrance westerly along the southerly side of the building to the sidewalk running north and south between the court houses. From the inner or northerly line of this areaway at the west end the sidewalk between the two court houses curves to the east opposite the southwesterly corner of the City Court House. The general width of the areaway is six feet, eight inches, but from about the westerly line of the City Court House it becomes narrower owing to the curving of the sidewalk. A wall with a coping twelve inches in width extends along the outer line of the areaway, around to the stairway descending into the areaway. This coping at the easterly end where it meets the line of the stairway descending into the areaway, extends one and one-half inches above the sidewalk, and from that point westerly it gradually increases in height above the sidewalk to seven and one-half inches, where it meets the coping running to the corner of the building. There are four windows opening from the areaway into the basement, and the reasonable inference is that the areaway was constructed to light the basement.

The plaintiff was employed at No. 38 Chambers street, and at about five-thirty P. M. on the 14th of January, 1919, while *en route* to take a Brooklyn bridge car, he passed southerly on the walk between the court houses, and was walking about a foot from the coping on the sidewalk where it curved, and on reaching a point about seven feet east of the southwest corner of the City Court House, he was jostled or jolted by another pedestrian going in the same direction, and his left foot hit the coping and he lost his balance and fell into this areaway and sustained injuries for which the recovery was had. He testified that it was raining at the time, but he described it as merely a heavy mist, and said that the walk was no more slippery than would be caused by ordinary dampness;

and that this had nothing to do with the accident; and that, while it was dark, he could see the coping and the sidewalk; and that, if he had not been jostled, he would not have fallen into the areaway; and that the jostling was " the only thing possible " that caused his fall. The theory on which the plaintiff recovered was that the defendant was guilty of negligence in so maintaining or in failing to guard the areaway.

The janitor of the City Court House testified that an inscription on a stone on the Chambers street side indicated that it was, built in the year 1852; but no evidence was offered and no statute was cited to show by whom or for what purpose the building was constructed or under whose jurisdiction it now is. It appears that it had been used for the City Court for upwards of twenty-six years, and that this areaway and coping remained in the same condition during that time. In behalf of the defendant testimony was given tending to show that during the last twenty-six years there had been no similar accident. The City Court came into being as the successor of the Marine Court by chapter 26 of the Laws of 1883. It must be assumed that the Brownstone Building and its appurtenances, which includes the areaway and the coping as constructed, were duly set apart for the use of the City Court, and it is probable that it has been used for court house purposes a very long time, for it appears by chapter 77 of the Laws of 1831 that buildings on the park were used or about to be used for court house purposes, and that act declared that all the buildings designated by the common council for the use of the courts or public offices within the territory then known as the City Hall Park, should be deemed to be included for all legal purposes in the term " City-Hall of the City of New York." That was substantially re-enacted by section 1073 of the Consolidation Act (Laws of 1882, chap. 410, as amd. by Laws of 1888, chap. 412). Chapter 206 of the Laws of 1853 and chapter 344 of the Laws of 1857 also authorized the use of buildings on the City Hall Park for court houses.

It appears that these sidewalks were extensively used, and that at different times of the day they were quite congested.

The most that can be claimed by the plaintiff from the evidence is that the city provided and maintained this court

house and its appurtenances; but in so doing it was performing a governmental function, and for negligence in the performance of such functions it was not liable. (*Alamango* v. *Supervisors of Albany County*, 25 Hun, 551; *Maxmilian* v. *Mayor*, 62 N. Y. 160; *Moest* v. *City of Buffalo*, 116 App. Div. 657; affd., on opinion below, 193 N. Y. 615; *Lefrois* v. *County of Monroe*, 162 id. 563; *Wilcox* v. *City of Rochster*, 190 id. 137; *Schlegel* v. *City of New York*, 90 Misc. Rep. 285; *D'Orsi* v. *City of New York*, 104 id. 66; *Goldfarb* v. *City of New York*, 108 id. 505; *Finkelstein* v. *City of New York*, 183 App. Div. 539.) The areaway and the coping around it were plainly appurtenant to the court house and formed no part of the sidewalk, and, therefore, the city could not be held liable for maintaining either the areaway or the coping in the condition that they were in at the time of the accident. Evidently the city, however, in its corporate capacity maintained the sidewalks and suffered, if it did not invite, their use by the public; and for failing to exercise ordinary care in constructing and maintaining them in a reasonably safe condition for the use of pedestrians the city would be liable. This distinction between the liability of the city in its corporate capacity and its non-liability in exercising governmental functions was not pointed out to the jury by the learned trial court, and from the manner in which the case was submitted it may be that the jury predicated their verdict on negligence on the part of the city in maintaining the open areaway. At the outset the court instructed the jury that the charge here was that in leaving this depression next to the building the city did not exercise ordinary care, and that the plaintiff's claim was that, owing to the depression on the edge of the sidewalk where throngs of people were passing to and fro, there should have been a better guard than this coping.

In the course of his direct examination the plaintiff was asked by his counsel with respect to the location of the sidewalk and the areaway and whether there was anything " intervening," and he answered, " No, there is nothing intervening; there is the railing on that side." This evidently referred to a fence erected on the coping after the accident. The court stated to the jury that the fact that such a fence had

been erected was shown inadvertently, and instructed them that the issues were to be determined on the facts as they existed at the time of the accident, and that they should not be influenced by the fact that a fence had been subsequently erected. At the request of one of the jurors the jury were permitted by consent to examine the *locus in quo.* The court did everything possible to make it clear to the jury that they should disregard that fact in determining the issues; but the fact was of such a nature, particularly in view of the inspection by the jury, that it was practically impossible for them to disregard it (*Murphy* v. *McMahon,* 179 App. Div. 837), and I am of opinion that it was prejudicial, and may account for the verdict, which I think is against the weight of the evidence.

The jury were instructed to consider that the areaway was there with the coping on the edge of the depression and the sidewalk next to the coping, and on those facts to determine whether the city, in not foreseeing that a pedestrian was likely to be shoved into the areaway and in not doing something to guard against it, exercised reasonable care; and that if the city was negligent and the plaintiff was free from contributory negligence, he was entitled to recover. Later on the court charged the jury with respect to the defendant's negligence as follows: " Was it negligent in leaving that place just as it is shown in the photograph, a wide sidewalk coping twelve inches wide running from five and a half inches I think down to nothing? Of course, there remember that you take in the whole situation."

The attention of the jury was then drawn by the court to the fact that the stairway in front of the building projected out a considerable distance beyond the line of the coping, which would tend to keep the crowd away from the coping, and that in a measure this was a safeguard particularly at the point opposite the areaway where the coping was the lowest, and that this was to be taken into consideration in determining whether or not the city was negligent. The court then put to the jury the question as to whether the city was negligent " in leaving that without some better safeguard to keep people from being pushed over." At the close of the charge in chief and after a request for further instructions had been made by

counsel for the plaintiff, the court again put the question to the jury as to whether the city was negligent " in leaving that place as it is shown in that picture." Thereafter in instructing the jury with respect to the duty of the city's representatives in the premises, the jury were asked to consider whether those charged with the responsibility in the premises were negligent in deeming, in view of the fact that the stairway thus projected, that there was no danger that any one would fall into the areaway, and that, if they erred in so determining, and the jury should determine that they should have put a fence there, they might find that the city was negligent. The court also instructed the jury at the request of counsel for the city that the fact that the place was traversed by thousands of people every day without injury should be taken into consideration by the jury in determining whether the city used reasonable care in leaving the place as it was; but the court also charged that, if a dangerous condition existed, the city was not relieved from liability by the fact that no one sustained injuries there before, and that the evidence with respect to there being no former accident was of an inconclusive nature. During the making of requests to charge the court also instructed the jury that, as a matter of law, the city actually had notice of existing conditions, and " The gravamen of that charge against the city is that it did not have a fence there instead of a coping or something that would prevent this man from being shoved in by a fellow pedestrian."

The case differs very materially from *Donnelly* v. *City of Rochester* (166 N. Y. 315), where at the business center of the city of Rochester the authorities had permitted to exist for a number of years an areaway extending six feet and four inches into the principal business street, and twelve feet, three inches below the grade of the sidewalk, guarded only by a railing two and a half feet high erected along the edge of the sidewalk, and the plaintiff's intestate, while lawfully using the walk, slipped on snow and was precipitated over the railing and into the areaway. An ordinance of the city provided that such openings should be guarded by a substantial rail on the sides thereof at least three and a half feet in height. The court held that the city could not be held liable for failing to enforce its own ordinances, but the fact that

it had enacted such ordinances might be considered in determining whether it had performed its duty to maintain the street reasonably safe and secure for travel (decision so explained in *Amberg* v. *Kinley*, 214 N. Y. 531, 540), and in view of the length of time the areaway had existed, a question of fact was presented as to whether the railing constituted a sufficient protection to persons passing on the principal business and most-frequented street in the city. The court, in stating that the case was not one for the application of the rule that since no previous accident had happened on account of the height of the railing, danger could not have been anticipated, said that accidents had occurred from persons falling into that areaway, although not at the precise point where the decedent went over the railing, and further added: " The presence of a deep excavation along the line of the sidewalk, unless sufficiently guarded, necessarily created danger." It is to be inferred, however, that there was no coping and that the line of travel brought pedestrians alongside the railing, whereas here they were guided away from the areaway by the projecting stairway and the areaway cannot be said to constitute a deep and dangerous excavation along the line of the sidewalk. This depression was somewhat deeper than gutters along the curbs of the public streets, but otherwise it was quite similar. Pedestrians may be pushed or jostled off the curb into a gutter and injured, but surely it could not be held to be the duty of the city to place railings on the curbs.

In all probability, the areaway, coping and sidewalk were in substantially the same condition as when originally constructed, which, as the evidence indicates, was probably about 1852. We have then a period of nearly seventy years with no evidence of any prior accident from the condition of the sidewalk, areaway or coping. I am, therefore, of opinion that this case falls within the general rule with respect to unforeseen accidents, and that the evidence is insufficient to warrant a jury in finding that the city was guilty of negligence in not foreseeing that an accident was likely to happen in this manner by a pedestrian in the first instance being jolted by another pedestrian, and in the second instance tripping on the coping, and in the third instance so landing in the areaway as to sustain injuries, and in failing to guard against the same.

(*Dougan* v. *Champlain Transportation Co.,* 56 N. Y. 1; *McGrell* v. *Buffalo Office Bldg. Co.,* 153 id. 265; *Cleveland* v. *N. J. S. Co.,* 125 id. 299; *Ayers* v. *Rochester R. Co.,* 156 id. 104; *Maue* v. *Erie R. R. Co.,* 198 id. 221, 228; *Loftus* v. *Union Ferry Co. of Brooklyn,* 84 id. 455; *Lafflin* v. *Buffalo & Southwestern R. R. Co.,* 106 id. 136.) In *Loftus* v. *Union Ferry Co. of Brooklyn* (*supra*) a child, while leaving one of defendant's ferryboats, fell through a guard rail of the bridge from the deck to the dock and was drowned, but no like accident had theretofore happened, and although it was manifest to any one that the opening in the guard rail was sufficient to enable the body of the child to pass through it, the carrier was held not liable upon the ground that the sufficiency of the guard rail had been shown by its use without accident for many years. The court said: " That it was possible for a child, or even a man, to get through the opening was apparent enough. But that this was likely to occur was negatived by the fact that multitudes of persons had passed over the bridge without the occurrence of such a casualty."

Moreover, here, I think, there was no ordinance requiring a railing on the coping or other protection for the areaway. The ordinance claimed to be applicable is section 161 of chapter 23 of the Code of Ordinances of the City of New York, which provides as follows:

" Areas; special restrictions.— Every existing area that is open at the top shall be inclosed with an iron railing in front, and on the sides where there is an opening used for the purposes of ingress and egress, such a railing to be at least 3 feet high measured from the base and capable of sustaining a lateral weight of 300 pounds at any part thereof, the gates of which, if any, shall be so constructed as to open inwardly."

The phraseology of this ordinance is very broad, but manifestly it must not only be confined to areas in the city, but to those over which the local authorities who enacted the ordinance had jurisdiction. Necessarily it does not apply to areas on private premises; and I am of opinion that it does not apply to areas on public grounds, but relates only to areas as thereinbefore defined and regulated. We find in section 170 of chapter 5 of the Code of Ordinances (being Building Code), relating to projections into the streets beyond the

building line, the word " areas " defined as meaning " open spaces below the ground level immediately outside the building and enclosed by substantial walls; " and they are permitted to project beyond the building line and into the street to the extent of one-fifteenth of the width of the street, but not exceeding five feet, and are required to be covered at the street level by an approved grating of metal or other incombustible material of sufficient strength to carry pedestrians safely. As I view it, the board of aldermen, having thus provided with respect to areas to be made in public streets in the future, by said section 161 of chapter 23 provided with respect to such areas as were then in existence and open at the top, that they should be inclosed as therein provided. Manifestly, the ordinance was intended to apply to the owners or occupants of premises abutting on public streets, to whose buildings or premises such an areaway was appurtenant, and was in no manner intended to regulate the duty of the city authorities with respect to public grounds and places. Doubtless, as was held in *Donnelly* v. *City of Rochester* (*supra*) the ordinance with respect to guarding the areaways in the public streets might be taken into consideration as indicating that the board of aldermen recognize that if they were not so guarded, they would be dangerous to public travel; but since they did not legislate in this regard with respect to parks or other public grounds, the ordinance is, I think, without effect upon the issues in this action. I deem it quite clear that this is not a public street within the contemplation of the provisions of the ordinances cited, and that, therefore, they are not applicable to the areaway in question. For these reasons I am of opinion that there should be a new trial on which, if the evidence is not materially different from that now before the court, the complaint should be dismissed, and if a case for the consideration of the jury is presented they should be clearly instructed that the city cannot be held liable for maintaining the areaway or the coping, and that the only possible theory upon which it may be held liable is for negligence in maintaining the sidewalk, which evidently was not maintained exclusively as an approach to either court house, without any railing or other guard, in view of the fact that there were adjacent thereto the coping and areaway which were appur-

tenant to the court house and for the maintenance of which as they existed the city is not liable.

It follows that the judgment and order should be reversed and a new trial granted, with costs to the appellant to abide the event.

CLARKE, P. J., and MERRELL, J., concur; DOWLING and PAGE, JJ., dissent.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.